Neal Anthony **CARTER,** etc., et al.,

v.

**UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY,** etc., et al.

**Civ. A. No. 91–3645 (NHP).**

United States District Court, D. New Jersey.·

Dec. 6, 1993.

---

Marilyn A. Rigmaiden, Eaton, McClellan & Allen, Philadelphia, PA, for plaintiffs.

Robert W. Donnelly, Jr., Dughi and Hewit, Cranford, NJ, for defendants Victor Tuma, M.D., Metuchen Pediatric Associates, P.A.

POLITAN, District Judge.

This matter comes before the Court on the motion of defendants Victor Tuma, M.D. and Metuchen Pediatric Associates, P.A., for partial summary judgment dismissing the individual claims of plaintiffs Gail P. Carter and Craig A. Carter on the grounds that such claims are barred by the applicable statute of limitations. I heard oral argument in this

matter and reserved decision. For the reasons set forth herein, defendants' motion for partial summary judgment is hereby **DENIED**.

## STATEMENT OF FACTS

Plaintiffs Gail P. Carter and Craig A. Carter, individually and on behalf of their infant son Neal A. Carter, instituted this malpractice action on August 16, 1991. Plaintiffs' original Complaint alleged that defendants University of Medicine and Dentistry of New Jersey ("UMDNJ"), Victor Tuma, M.D. (a board certified pediatrician), Lawrence Taft, M.D., and Metuchen Pediatrics Associates, P.A. ("Metuchen"), failed to diagnose and treat properly the infant plaintiff's neurological medical condition, hydrocephalus.[1] An amended Complaint was filed with leave of this Court on June 23, 1993, adding Eleftherios Halivopoulos, M.D., also a board certified pediatrician, as a defendant.

Neal Carter was born on December 15, 1983, at the John F. Kennedy Hospital in Orange, New Jersey. Upon observing various abnormalities in the newborn infant, including a flattened lower lip, a large head and only two umbilical veins, the attending obstetrician, Dr. Drucker (who is not a defendant in this action) referred plaintiffs to defendants Metuchen, Dr. Tuma and Dr. Halivopoulos for both in-patient newborn care as well as follow-up pediatric treatment. The infant remained under the care of these doctors until July 1, 1984. In April 1984, the child also was examined by defendant Dr. Taft at UMDNJ. Sometime in 1984, plaintiffs relocated to Maryland where Neal received pediatric and neurological care from various physicians in the Washington, D.C. area. Subsequent to this move the named defendants rendered no further medical care to the infant.

Plaintiffs Gail and Craig Carter assert that when they left the care of defendants, they were unaware that Neal was suffering from any type of neurological impairment. *See* Deposition of Gail P. Carter, at 48:5–9. Although Gail Carter testified that she first observed developmental problems with Neal in the first year of his life, plaintiffs insist that, because of statements made by Drs. Tuma and Taft, they had no reason to believe that Neal was suffering from any neurological abnormality.[2]

In 1987, Mr. and Mrs. Carter consulted an attorney regarding the medical care provided to Neal. Deposition of Gail P. Carter, at 116:19–24. Plaintiffs assert that at the time they consulted this attorney they had no reason to know that Neal's medical problems were related to the medical care rendered by defendants. They argue that "this determination could not have been made until 1990, after plaintiffs' attorneys had obtained all of Neal Carter's medical records and had them reviewed by experts." Plaintiffs' Brief at 3. The attorney consulted by plaintiffs did, however, forward authorizations from plaintiffs for the release of Neal's medical records in April 1987, to Dr. Tuma and Dr. Taft. Defendants' Exhibit B. There is nothing before the Court to indicate when those materials were actually forwarded to the attorney for review, but the authorizations clearly establish that all of the medical records were available for review in April 1987. Thereafter, in 1990 plaintiffs obtained an opinion from a medical expert that the care rendered by defendants was below acceptable standards. The present action was subsequently instituted.

## DISCUSSION

According to Rule 56, summary judgment may only be granted if, from an examination

---

1. Hydrocephalus is a neurological condition marked by dilation of the cerebral ventricles, most often occurring secondarily to obstruction of the cerebrospinal fluid pathways and accompanied by an accumulation of cerebrospinal fluid within the skull. The condition is typically characterized by enlargement of the head, prominence of the forehead, brain atrophy, mental deterioration and convulsions. Dorland's Illustrated Medical Dictionary (27th ed. 1988).

2. For instance, Dr. Tuma stated that he believed that Neal's abnormally large head size was due to Neal's generally large size. *See* Deposition of Victor Tuma, M.D., at 52:8–16. Dr. Taft commented that despite the fact that at the time of the neurological examination Neal's head circumference fell around the 98th percentile, he believed that Neal's head was within normal limits. *See* Deposition of Lawrence Taft, M.D., at 37:5–18.

of the pleadings and the proofs before the court, no genuine issue as to a material fact remains for trial and the movant is entitled to judgment as a matter of law. *See Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Inferences flowing from the proofs before the court must be viewed in the light most favorable to the non-moving party. *Id.* Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, for which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of genuine issue of material fact. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)).

The instant summary judgment motion is directed solely at the adult plaintiffs's claims for (1) the extraordinary medical expenses incurred in providing their son the necessary medical care and (2) loss of consortium, companionship, society and services of their son. I will address each claim *in seriatim.*

### A. Claim for Extraordinary Medical Expenses

Defendants contend that the adult plaintiffs' claims are barred by the applicable two year statute of limitations, which provides:

> Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this state shall be commenced within 2 years next after the cause of any such action shall have accrued.

N.J.S.A. 2A:14–2 (West 1987). While the statute is explicit in its mandate that a negli-

gence action be brought within two years of its accrual, it is silent as to when the accrual of any such cause of action in fact occurs. *See Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 570 (3d Cir.1976).

In its first effort to determine the moment of accrual, the New Jersey Supreme Court held that the two year limitations period did not begin to run until the plaintiff knew or had reason to know of the post-operative presence of a foreign object in her body. *See generally Fernandi v. Strully,* 35 N.J. 434, 173 A.2d 277 (1961). In time, the court articulated the present discovery rule, under which "a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Lopez v. Swyer,* 62 N.J. 267, 272, 300 A.2d 563 (1973). Furthermore, the court held that the burden of avoiding the statutory time bar rests upon the party seeking the discovery rule's particular indulgence. *Lopez,* 62 N.J. at 276, 300 A.2d 563. Indeed, the plaintiff must establish that she did not know the fact of the injury's existence or to whom the injury was attributable, nor could she, under all of the circumstances, reasonably have known it." *Id.* at 276 n. 4, 300 A.2d 563.

Plaintiffs filed the instant Complaint on August 16, 1991. Consequently, in order to avoid dismissal on the basis of the expiration of the statute of limitations, plaintiffs' cause of action must not have accrued prior to August 16, 1989. In an effort to employ the aforementioned discovery rule, plaintiffs assert that their claim did not accrue until 1990 when they received confirmation from a medical expert that the doctors named in the Complaint were negligent in failing properly to diagnose and treat Neal's condition. Defendants conversely contend that the cause of action accrued when the adult plaintiffs first visited an attorney in 1987 regarding the medical care rendered to Neal.

I am satisfied that the undisputed facts establish the plaintiffs' cause of action was known or should have been known to

plaintiffs prior to August 16, 1989.[3] The deposition testimony reveals that Mrs. Carter observed abnormalities in Neal's development in the first year of his life. Admittedly, the Carters may have been misled by the reassurances of Drs. Tuma and Taft that Neal's head circumference was normal and as such it could be reasonably inferred that while under the care of these physicians, plaintiffs could not reasonably have known that a cause of action existed.

However, this inference, though reasonable, does not constrain me in any way since it is clear that in 1987 the adult plaintiffs at the very least strongly suspected possible negligence in the level of care defendants provided to Neal. The proofs indicate that at sometime in 1984, the Carters relocated to Maryland and Neal subsequently received treatment from physicians in the Washington, D.C. area. Neither party has informed the Court as to what type of medical treatments and analyses were performed during this period and at what point in time plaintiffs were actually told that Neal suffered from hydrocephalus. It is undisputed that as early as April 1987, however, the parents consulted an attorney regarding the care rendered to Neal by defendants. Moreover, in that same month the adult plaintiffs authorized defendants to release Neal's medical records.

But, it was not until almost three years following the authorization of the release of the records that plaintiffs obtained an expert medical opinion that defendants were negligent in their care for Neal. Instead of proffering an explanation for this delay, plaintiffs merely assert that they did not know at that time that Neal's medical problems were related to the care rendered by defendants and could not have known until they obtained expert medical determination in 1990. But any contention that the cause of action did not accrue until plaintiffs received confirmation from medical experts that the care rendered to Neal was below acceptable standards is contrary to New Jersey law. *See Brizak v. Needle,* 239 N.J.Super. 415, 426–27, 571 A.2d 975 (App.Div.), *certif. denied,* 122 N.J. 164, 584 A.2d 230 (1990) (rejecting contention that commencement of running of statute of limitations was delayed until plaintiff obtained expert opinion that physician's conduct amounted to malpractice).

■ Consequently, the only rational inference to be drawn by the undisputed facts is that upon consultation of the attorney in 1987, plaintiffs were aware that the care provided by defendants may have been faulty. The law is clear that under the discovery rule a plaintiff must exercise due diligence in identifying a potential cause of action. *See Gleason v. United States,* 458 F.2d 171, 174 (3d Cir.1972). Plaintiffs' only explanation for delaying the filing of the instant Complaint until August 16, 1991, is that their knowledge of the claim depended on confirmation from a medical expert. But, as noted above, this explanation must be rejected as a matter of law. Accordingly, it appears that Craig and Gail Carter's claim for extraordinary medical expenses is barred by the two year statute of limitations.

■ However, this two year limitations statute is but a momentary obstacle to the Carters' ability to assert their cause of action, as they alternately contend that even if the Court finds that they did not seek recovery within two years of accrual of their claims, they are nevertheless entitled to an extended time period in which to file their action pursuant to N.J.S.A. 2A:14–2.1.

■ Under New Jersey law, a parent's claim for damages sustained as a result of injuries to her minor child may be asserted

---

3. Under New Jersey law, the issue of the expiration of the statute of limitations is a decision for the court. *Lopez,* 62 N.J. at 274–76, 300 A.2d 563. The Third Circuit, however, has determined that notwithstanding the rule in *Lopez,* in a diversity action in federal court, the jury is the proper party to resolve disputed fact issues surrounding the statute of limitations defense. *See Goodman,* 534 F.2d at 575 (reversing the district court's grant of summary judgment based on the statute of limitations and stating that the jury and not the court was the proper body to draw inferences as to the plaintiff's state of mind). Thus, this Court may only grant summary judgment if taking the inferences regarding plaintiffs' state of mind in a light most favorable to plaintiffs, there is no genuine issue of material fact that they had and could maintain a cause of action against defendants prior to August 16, 1989.

within the same period of time as that provided for the assertion of that child's own claim. N.J.S.A. 2A:14–2.1 specifically provides:

> Where a parent or other person has a claim for damages suffered by him because of an injury to a minor child caused by the wrongful act, neglect or default of any person within this State, an action at law upon such claim may be commenced by the said parent or other person within the same period of time as provided by law in the case of the said minor child so injured, provided that, if an action is commenced by or on behalf of the said minor child, the said claim of the parents or other person shall be asserted and maintained in such action brought on behalf of the injured minor child either as a plaintiff or third-party plaintiff and if not so asserted shall be barred by judgment in the action brought on behalf of said injured minor child.

N.J.S.A. 2A:14–2.1 (West 1987). This statute essentially provides that the time period for the commencement of an action of a parental claim is coextensive with the limitation period applicable to the minor child's claim, as long as both claims are asserted in the same action. *Vedutis v. Tesi*, 135 N.J.Super. 337, 341–42, 343 A.2d 171 (Law Div.), *aff'd*, 142 N.J.Super. 492, 362 A.2d 51 (App.Div.1976). A parent may avoid the general two year statute of limitations by pigeonholing her claim into the greater statutory period accorded the minor child, as long as the parent's claim is derivative of the underlying claim of her minor child. *See Procanik v. Cillo*, 97 N.J. 339, 356, 478 A.2d 755 (1984).[4]

Defendants assert that the adult plaintiffs' claim for extraordinary medical damages cannot come within the protective ambit of N.J.S.A. 2A:14–2.1 because that claim stands as an independent allegation not derived from the child's injury. To buttress this assertion defendants have directed this Court's attention to the New Jersey Supreme Court's decisions in *Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981), and *Procanik v. Cillo*. In both cases, the New Jersey court held that parents' claims of medical expenses arising from their child's birth defects did not in fact derive from their child's action against defendant-physicians, but rather stood on independent grounds and hence could not fall within N.J.S.A. 2A:14–2.1. *Schroeder*, 87 N.J. at 66, 432 A.2d 834; *Procanik*, 97 N.J. at 355–56, 478 A.2d 755.

Consequently, defendants argue, since the adult plaintiffs in this action present essentially the same claim for extraordinary medical expenses as was proffered in *Schroeder* and *Procanik*, those cases should control and the time bar of N.J.S.A. 2A:14–2 should foreclose any consideration of their claim. In essence, defendants are requesting that I articulate a blanket rule, based upon *Schroeder* and *Procanik*, that deems *all* parental claims for medical expenses to be outside the savings provision of N.J.S.A. 2A:14–2.1. This contention, however, fails to take into account the fact that *Schroeder*, *Procanik*, and their principal progenitor, *Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979), have addressed the issue of parental claim derivation only within the narrow and highly specialized context of the wrongful birth and/or wrongful life tort action.

Before proceeding to the analysis of N.J.S.A. 2A:14–2.1's application to the adult plaintiffs' claim in this case, a brief review of the evolution of wrongful life and wrongful birth causes of action in New Jersey's courts is necessary. Originally, in *Gleitman v. Cos-*

---

4. New Jersey law provides:

> If any person entitled to any of the actions or proceedings specified in sections 2A:14–1 to 2A:14–8 or sections 2A:14–16 to 2A:14–20 of this title or to a right or title of entry under section 2A:14–6 of this title is or shall be, at the time of any such cause of action or right or title accruing, under the age of 21 years, or insane, such person may commence such action or make such entry, within such time as limited by said sections, after his coming to or being of full age or of sane mind.

N.J.S.A. 2A:14–21 (West 1987). The New Jersey Supreme Court has recently determined, in reference to N.J.S.A. 2A:14–21, that the statutory reduction of the age of majority from 21 to 18 years of age reduced from 21 to 18 the age until which limitations periods were tolled, even though the state legislature did not amend N.J.S.A. 2A:14–21. *Green v. Auerbach Chevrolet Corp.*, 127 N.J. 591, 606 A.2d 1093 (1992). In the instant action it is undisputed that infant Neal Carter has asserted his claims in a timely manner.

*grove,* 49 N.J. 22, 227 A.2d 689 (1967), the New Jersey Supreme Court, in refusing to recognize a cause of action bottomed on wrongful birth,[5] denied recovery for medical expenses to the parents of a child born with visual and auditory defects due to a physician's failure to advise the child's mother of the risks of rubella to a child *in utero* during her pregnancy. The court's denial of damages was predicated on what it considered the logical impossibility of measuring "the value of life with impairments against the nonexistence of life itself." *Gleitman,* 49 N.J. at 28, 227 A.2d 689. Furthermore, while the court assumed that an abortion could have been obtained without subjecting its participants to criminal liability, "substantial policy reasons" nevertheless precluded the court "from allowing tort damages for the denial of the opportunity to take an embryonic life." *Id.* at 30, 227 A.2d 689. Distilled to its purest essence, the public policy concern which weighed most heavily on the court was its notion that "[i]t is basic to the human condition to seek life and hold on to it however heavily burdened" and, ultimately, that "[t]he right to life is inalienable in our society." *Id.,* 227 A.2d 689.

Prior to the court's next encounter with the wrongful birth claim, the seminal decision of *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), firmly established that a woman possesses a constitutional right to terminate her pregnancy, at least during the first trimester. Accordingly, when the New Jersey court revisited this area of law in *Berman v. Allan,* it found that "[p]ublic policy now supports, rather than militates against, the proposition that [a woman] not be impermissibly denied the opportunity to make that decision." *Berman v. Allan,* 80 N.J. 421, 432, 404 A.2d 8 (1979). In *Berman,*

the court was faced with a case centered on the defendant-physicians' failure to advise a thirty-eight-year-old woman to undergo amniocentesis. *Berman,* 80 N.J. at 424, 404 A.2d 8. Her child was subsequently born with Downs Syndrome, a condition which the amniocentesis procedure could have identified. The court held that the parents had a cause of action for wrongful birth because the mother had been deprived of an opportunity to choose whether to abort the fetus; as the court noted, "a physician whose negligence has deprived a mother of this opportunity [to choose an abortion] should be required to make amends for the damage he has proximately caused." *Id.* at 432, 404 A.2d 8. The infant's wrongful life claim was rejected, however, since she had "not suffered any damage cognizable at law by being brought into existence." *Id.* at 429, 404 A.2d 8. While allowing the parents to recover damages for the emotional distress associated with the birth of a child afflicted with Down's Syndrome, the court found an award of damages for the child's education and supervision too unreasonable a financial burden to place upon the defendant-physicians. *Id.* at 432, 404 A.2d 8.

Thereafter, in *Schroeder v. Perkel,* the New Jersey court permitted successful wrongful-birth claimants to recover the extraordinary expenses of raising a child born with cystic fibrosis, including medical, hospital and pharmaceutical expenses. *Schroeder,* 87 N.J. at 68–69, 432 A.2d 834. In *Schroeder,* the alleged negligence centered upon the defendant-physicians' purported failure to diagnose cystic fibrosis in the plaintiff-parents' first child which allegedly deprived the parents of an informed choice whether to have a second child. *Id.* at 57, 432 A.2d 834.[6] The defendants did not diagnose the Schroeders'

---

5. A claim for "wrongful life" has been distinguished from "wrongful birth" by the New Jersey court in *Procanik* as follows:

 "[W]rongful life" refers to a cause of action brought by or on behalf of a defective child who claims that but for the defendant doctor's negligent advice to or treatment of its parents, the child would not have been born. "Wrongful birth" applies to the cause of action of parents who claim that the negligent advice or treatment deprived them of the choice of avoiding conception or, as here, of terminating the pregnancy.

*Procanik,* 97 N.J. at 348, 478 A.2d 755 (citations omitted).

6. While cystic fibrosis cannot be detected in a fetus, post-birth tests can be performed which will disclose the condition. If a child tests positive for cystic fibrosis, it indicates that both parents are carriers and that in all probability any future children of those parents will be afflicted with this fatal genetic disease. *See Schroeder,* 87 N.J. at 59, 432 A.2d 834.

first child's illness as cystic fibrosis until Mrs. Schroeder was eight months pregnant with her second child who, two weeks after his birth, was diagnosed with cystic fibrosis. *Id.* at 60, 432 A.2d 834. The court found that the parents were deprived of the choice whether to conceive a second child with cystic fibrosis whose birth would impose extensive medical expenses on them, and as such the parents possessed an independent claim for those expenses. *Id.* at 66, 432 A.2d 834.

Finally, in *Procanik v. Cillo,* the court recognized that a child possesses a legally cognizable claim for wrongful life, and held that said child may recover the extraordinary lifetime medical expenses incurred as a result of a misdiagnosis that deprived its parents of making an informed choice whether to terminate the pregnancy. In *Procanik,* the infant plaintiff asserted a claim for birth defects and impaired childhood, while his parents sought damages for emotional distress and the extraordinary medical expenses incurred as a result of their son's medical condition. *Procanik,* 97 N.J. at 343, 478 A.2d 755.[7]

The court found while that the infant plaintiff could recover special damages for extraordinary medical expenses incurred during his infancy, his parents' claim for those expenses could not be permitted because it would in essence sanction a windfall or double recovery, and also because the parents' claim for medical expenses was not instituted in a timely fashion. *Id.* at 356, 478 A.2d 755. In finding the adult plaintiffs' claim to be barred by the applicable two year statue of limitations, the court refused to apply N.J.S.A. 2A:14–2.1 on the grounds that the parental claim for medical damages did not derive from the child's underlying claim and hence could not come within the statute. *Id.* at 355–56, 478 A.2d 755, *citing Schroeder,* 87 N.J. 53, 432 A.2d 834.

Thus, as defendants note, the *Procanik* court, relying specifically on *Schroeder,* deemed the parents' claim for extraordinary medical expenses to be independent from that of their minor child. *Id.,* 97 N.J. at 355–56, 478 A.2d 755. Indeed, as defendants also state, *Procanik* further holds that "[t]he defect in the parents' argument in the present case is that their right to recover is not 'because of injury' to their child, but because of direct injury to their own independent rights." *Id.* at 356, 478 A.2d 755.

However, the holdings in *Berman, Schroeder,* and *Procanik,* insofar as the independence of the parental claims is implicated, are each balanced upon the very narrow fulcrum of a parent's right to choose to abort a child whose abnormal physical condition(s) could either be verified *in utero* or safely predicted. Indeed, as the New Jersey Supreme Court recently stated, "[t]he breaches of duty in *Procanik, Berman,* and *Schroeder* all revolve, at least in part, around the defendant-doctor's failure to diagnose a condition that might have caused the parents to terminate the pregnancy had they been informed of that condition." *Hummel v. Reiss,* 129 N.J. 118, 126, 608 A.2d 1341 (1992).

Clearly, then, the discourse of "choice" as it relates to abortion pervades each of the aforementioned decisions. The linchpin of those cases is the parents' right, as a result of both *Roe v. Wade* and the breathless advance of medical knowledge, to decide whether to bring a severely handicapped child into the world or to instead unfetter him from the realm of the physical before he draws that incipient breath. Any proper analysis of the New Jersey court's findings of nonderivativeness regarding claims for extraordinary medical expenses cannot, therefore, be divorced from this context.

When viewed from the perspective of choice, the New Jersey Supreme Court's finding of the parents' claims to be nonderivative in nature appears fitting and proper. Indeed, what the parents in the trilogy of cases discussed herein lost, as a result of their physicians' claimed negligence, was

---

7. The plaintiffs specifically alleged that Mrs. Procanik's physician failed to inform her that she had contracted German measles during the first trimester of her pregnancy. *Procanik,* 97 N.J. at 343, 478 A.2d 755. Unaware of her condition, Mrs. Procanik allowed her pregnancy to continue. Her son was subsequently born with congenital rubella syndrome, and concomitant thereto was plagued with a myriad of medical problems, including eye lesions, heart disease, and auditory defects. *Id.* at 343–44, 478 A.2d 755.

their *own* independent constitutional right to decide to abort a child whom the Fates had visited with debilitating conditions, or, alternately, their *own* independent right to make an informed choice whether to conceive a child who would in all probability be saddled with mental and/or physical impairments.

As the court, in evaluating both *Schroeder* and *Berman*, stated, "[p]arents have a right of their own either to accept or reject a parental relationship, and the deprivation of that right by the negligent misconduct of another creates a cause of action in the parents." *Schroeder*, 87 N.J. at 66, 432 A.2d 834.[8] It is obvious, then, that the parental claims were found in *Berman, Schroeder*, and *Procanik* to be independent and not derivative of the child's cause of action not because the medical expenses were found to have originated from any action perpetrated upon the child. Rather, they were instead deemed to be solely the result of the negligent deprivation of the parent's choice to determine whether to conceive and/or bring to term a child whose existence outside the womb would impose extensive medical expenses.

But here, this is not the case. The present action is patently distinguishable from the decisions discussed above in that the claim of the adult plaintiffs before me does not arise from a deprivation of their own abortion rights, but rather, from an injury which their child has suffered, allegedly at defendants' hands. The extraordinary medical expenses which Gail and Craig Carter seek are not as a result of their inability to reject a parental relationship before it commenced; indeed, notions of choice are nowhere implicated in the case at bar. Instead, the Carters merely seek contributions from defendants for an injury to their son purportedly committed by defendants. The *raison d'etre* underlying the Carters' claim is their desire to receive compensation for damages deriving from an allegedly tortious act perpetrated by defendants upon their son.

The New Jersey Supreme Court has cautioned against ignoring "a critical aspect of *Procanik:* that case leaves no doubt that its rule—as indeed is the case with *Berman* and *Schroeder*—is premised on the availability of lawful eugenic abortions." *See Hummel,* 129 N.J. at 125, 608 A.2d 1341. This admonition was employed by the court in its ruling that the trilogy of cases cannot be applicable to cases arising before the United States Supreme Court's opinion in *Roe v. Wade. Id.,* 608 A.2d 1341. This caveat may also be fairly taken as a deliberate confinement of these decisions to the abortion arena. Since the adult plaintiffs are presently not within that realm, it seems contrary to the New Jersey court's expressed intent to extend the findings of independence of deprivation of choice claims in abortion cases into the more prosaic field of routine medical negligence.

Furthermore, to argue that the New Jersey Supreme Court has conclusively spoken on the subject of N.J.S.A. 2A:14–2.1 as it relates to derivative parental claims is simply unfounded, since of the three cases to which this discourse has been heretofore addressed, only *Procanik* even refers to the resuscitating provisions of that statute. *See Procanik,* 97 N.J. at 355–56, 478 A.2d 755. This referral itself is completely encapsuled within one paragraph and relies entirely upon the *Schroeder* and *Berman* decisions, which, as has been demonstrated, are inapposite here. Thus, without a more specific directive from the New Jersey court that it definitively intended to classify *all* parental claims for extraordinary medical expenses as independent and consequently outside the reach of N.J.S.A. 2A:14–2.1, I will not so find here.

Accordingly, for the reasons articulated above, the adult plaintiffs' claim for extraordinary medical expenses may be asserted in

8. Indeed, as the court noted in *Schroeder*, "[t]he delay in the diagnosis [of their first child's cystic fibrosis] had precluded Mr. and Mrs. Schroeder from making an informed choice as to whether or not to assume the risk of conceiving a second child with cystic fibrosis.... [and] also prevent- ed them from making an informed choice whether Mrs. Schroeder should have an abortion." *Schroeder,* 87 N.J. at 60, 432 A.2d 834. The court went on to state that "[i]n *Berman*, the parents were deprived of the choice whether to

the instant action pursuant to N.J.S.A. 2A:14–2.1.[9]

## B. Loss of Services, Consortium, Companionship, and Society

The adult plaintiffs have also alleged a claim for loss of their son's consortium, society, companionship, and services. Since this claim has likewise been tardily asserted, the Carters again attempt to invoke the extension provisions of N.J.S.A. 2A:14–2.1. Here, as in the foregoing discussion, the analytical cornerstone is the issue of the parental claims' independent or derivative nature.

Plaintiffs have seemingly subsumed their claim for loss of their child's services within their allegation of loss of his society and companionship (i.e., consortium). However, for the purposes of determining the claims' autonomous and/or derivative status, I will discuss each allegation separately.

 There are numerous New Jersey cases which permit a parent to recover for the loss of a child's services and earnings. See Davis v. Elizabeth Gen. Med. Ctr., 228 N.J.Super. 17, 19, 548 A.2d 528 (Law Div. 1988); Higgins v. Schneider, 61 N.J.Super. 36, 160 A.2d 165 (App.Div.), aff'd, 33 N.J. 299, 164 A.2d 299 (1960); Orr v. Orr, 36 N.J. 236, 176 A.2d 241 (1961); Maccia v. Tynes, 39 N.J.Super. 1, 120 A.2d 263 (App.Div.1956). Defendants contend that an initial reading of some of these cases indicates that these claims for loss of services, while consequential, are independent from the claims asserted by the infant plaintiffs. They place great reliance upon Higgins v. Schneider, in which it was held that a father's action for loss of his child's services was separate and independent from his infant son's cause of action such that the extended statute of limitations applicable to the infant did not inure to the benefit of the father. Higgins, 61 N.J.Super. at 43–44, 160 A.2d 165.

However, reliance on Higgins in order to buttress the contention that a parental loss of services claim is independent and conse-

quently not within N.J.S.A. 2A:14–2.1 is misplaced for two reasons. First, Higgins was decided prior to the New Jersey legislature's enactment of the statute in 1964, and therefore its holding could not have contemplated foreclosing the applicability of a statute not yet in existence. Second, and of much greater import, is the fact that, as the Appellate Division has noted, N.J.S.A. 2A:14–2.1 in effect overruled Higgins v. Schneider. Rost v. Bd. of Ed. of Fair Lawn, 137 N.J.Super. 76, 78 n. 1, 347 A.2d 811 (App.Div.1975). See also Rost v. Bd. of Ed. of Fair Lawn, 130 N.J.Super. 187, 191, 325 A.2d 863 (Law.Div. 1974), rev'd, Rost, 137 N.J.Super. 76, 347 A.2d 811 (trial court noted in dicta that memoranda in the files of the State Archives from the Attorney General and Counsel to the Governor evidence that the legislative intent behind N.J.S.A. 2A:14–2.1 was to avoid the result in Higgins). Thus, it is clear that N.J.S.A. 2A:14–2.1 was specifically engineered to vitiate a judicial decision which held a parental claim for consequential damages to be not derivative but independent from that of the child. As such, it is also evident that a parental claim for loss of services has been accorded derivative status, pursuant to legislative action, such that the claim can fit neatly under the umbrella of N.J.S.A. 2A:14–2.1. Accordingly, I find that plaintiffs' claim for loss of services may be asserted in the instant action pursuant to that statute.

 Before next reaching the question of the independent or derivative status of plaintiffs' loss of consortium, companionship and society claim within the context of the parent-child relationship, it is first necessary to examine the actual state of that cause of action in New Jersey. While, as noted above, the New Jersey courts have dealt with the issue of parental recovery for loss of a child's services, there appears to be only two cases, both from the Law Division, which have specifically addressed the issue of pa-

---

bear the emotional burden of an afflicted child." Id. at 66, 432 A.2d 834.

**9.** Gail and Craig Carter's assertion of their own claim for extraordinary medical expenses of course precludes their son Neal from asserting the same claim. See Procanik, 97 N.J. at 351,

478 A.2d 755. Therefore, there is no longer any need, as was suggested at oral argument, for the minor plaintiff to amend the Complaint in order to assert his own claim for extraordinary medical damages.

rental recovery for the loss of a child's companionship and society in a negligence action.

In *Brennan v. Biber,* a mother sued on behalf of her children seeking to recover both for the injuries they sustained as well as her loss of her children's society and companionship. *Brennan v. Biber,* 93 N.J.Super. 351, 225 A.2d 742 (Law Div.1966), *aff'd,* 99 N.J.Super. 247, 239 A.2d 261 (App.Div.1968). The trial judge concluded, however, that no cause of action for loss of a child's society and companionship existed in New Jersey. *Brennan,* 93 N.J.Super. at 366, 225 A.2d 742. Its reasoning was predicated, *inter alia,* on the fact that those New Jersey cases which had authorized a parent to recover damages beyond medical expenses and loss of services had been confined to the area of intentional torts such as seduction of a child, where a parent could seek damages for the loss of her child's society as well as for the "dishonor" brought to herself and the family. *Id.* at 369, 225 A.2d 742 (and cases cited therein). These seduction cases expressly distinguished their allowance of so-called companionship damages as a result of this intentional tort from acts of mere negligence towards a minor child. *Brennan,* 93 N.J.Super. at 367, 225 A.2d 742, *citing Magee v. Holland,* 27 N.J.L. 86, 97 (Sup.Ct.1858).

However, when the Law Division revisited the loss of consortium claim in the parent-child context several years ago, it recognized the more progressive jurisprudential trend permitting a parent's *per quod* claim for loss of her child's society or companionship in negligence actions, based on either legislative provisions or "by analogy with the right of a spouse to recover damages for the loss of consortium." *Davis v. Elizabeth Gen. Med. Ctr.,* 228 N.J.Super. 17, 21, 548 A.2d 528 (Law Div.1988).[10] *See also Carey v. Lovett,* 132 N.J. 44, 67, 622 A.2d 1279 (1993). The court, in reviewing the decisions of courts of several jurisdictions, noted that it was in agreement with those decisions which recognized the right of a parent to recover the loss of aid, companionship and society of her child where such loss is occasioned by the negligence of another. *Davis,* 228 N.J.Super. at 21, 548 A.2d 528 (citations omitted). Having found no binding New Jersey precedent nor statute precluding a parent's *per quod* claim for the loss of a child's companionship and society, the court concluded, based on what it termed the enlightened and equitable reasoning of other jurisdictions which have sanctioned a parental loss of consortium action, that a parent in New Jersey had the same right to bring such a claim. *Id.* at 21–23, 548 A.2d 528. In addition, it is also to be noted that the Appellate Division by implication recognized the existence of a parental *per quod* claim arising from a minor child's injury in *Goncalvez v. Patuto,* 188 N.J.Super. 620, 458 A.2d 146 (App.Div.1983).[11]

Given the recent propensity of some courts, in New Jersey and elsewhere, to recognize a *per quod* claim in the parent-child setting, I am satisfied that the adult plaintiffs in the instant case have a right to assert claims for loss of consortium, companionship, and society.[12] Thus, I can now turn to the

10. *See, e.g., Reben v. Ely,* 146 Ariz. 309, 705 P.2d 1360 (Ct.App.1985); *Miller v. Subia,* 514 P.2d 79 (Colo.Ct.App.1973) (by implication); *Yordon v. Savage,* 279 So.2d 844 (Fla.1973); *Hayward v. Yost,* 72 Idaho 415, 242 P.2d 971 (1952), *Dymek v. Nyquist,* 128 Ill.App.3d 859, 469 N.E.2d 659 (1984); *First Trust Co. v. Scheels Hardware,* 429 N.W.2d 5 (N.D.1988); *Norvell v. Cuyahoga County Hosp.,* 11 Ohio App.3d 70, 463 N.E.2d 111 (1983); *Schockley v. Prier,* 66 Wis.2d 394, 225 N.W.2d 495 (1975).

11. At oral argument defendants' counsel did not question the existence of the parental loss of consortium, companionship and society claim in New Jersey, but rather, dealt solely with its independent and/or derivative nature.

12. This conclusion is in line with other New Jersey decisions. For instance, in *Green v. Bittner,* 85 N.J. 1, 424 A.2d 210 (1980), the New Jersey Supreme Court held that when parents sued for the wrongful death of their child, it would be a "miscarriage of justice" to limit their damages solely to loss of anticipated financial contributions by the child after she becomes a wage earner. *Green,* 85 N.J. at 4, 424 A.2d 210. Rather, "the jury should be allowed, under appropriate circumstances, to award damages for the parents' loss of their child's companionship as they grow older, when it may be most needed and valuable, as well as the advice and guidance that often accompanies it." *Id.,* 424 A.2d 210. Any other conclusion, intimated the court, "'would result in a return to the outmoded doctrine that a child is a liability—not an asset.'" *Id.,* 424 A.2d 210 (citations omitted).

question of whether this parental action is derivative of the child's injury such that it comes within the ambit of N.J.S.A. 2A:14–2.1, or is instead a separate and independent claim and consequently without the statute.

At the outset it must be noted that this issue has caused the parties much consternation, both in their briefs as well as at oral argument. Apparently, however, this agitation was unnecessary, as Judge Pressler of the Appellate Division found, in *Goncalvez v. Patuto,* 188 N.J.Super. 620, 458 A.2d 146 (App.Div.1983), that "N.J.S.A. 2A:14–2.1 specifically preserves the parental *per quod* claim during the entire period of viability of the child's claim and until the child's claim is brought." *Goncalvez,* 188 N.J.Super. at 630, 458 A.2d 146. In *Goncalvez,* a father instituted an action as guardian *ad litem* for his son Rui seeking damages for his emotional injury resulting from the son's observation of his brother's fatal accident. In addition, the father instituted a similar action for his emotional injuries when he himself witnessed Mario's tragic death. Finally, both parents asserted a *per quod* claim for damages resulting from Rui's emotional injury. *Id.* at 626, 458 A.2d 146.

The court reversed the trial court's grant of summary judgment for defendant on the *per quod* count. In so doing, the court explicitly noted that the *per quod* action of the adult plaintiffs' was derivative of their surviving son's cause of action such that the parents' present assertion of it was well within the extended statutory period afforded by N.J.S.A. 2A:14–2.1. *Id.* at 629–30, 458 A.2d 146.

This view of the derivative nature of the parental consortium claim has been echoed in analogous decisions addressing the issue of derivation in the context of a loss of consortium claim asserted by one spouse due to injury to the other as a result of a third party's negligence. The New Jersey courts have held that a spousal *per quod* claim is only maintainable by reason of a spouse's personal tort action. *See Tichenor v. Santillo,* 218 N.J.Super. 165, 173, 527 A.2d 78 (App.Div.1987); *Rex v. Hutner,* 26 N.J. 489, 492, 140 A.2d 753 (1958). The claim has been characterized as a derivative claim, not as an independent cause of action. *See Tichenor,* 218 N.J.Super. at 173, 527 A.2d 78; *Marsella v. Monmouth Medical Center,* 224 N.J.Super. 336, 341–42, 540 A.2d 865 (App.Div. 1988); *Wolfe v. State Farm Ins. Co.,* 224 N.J.Super. 348, 351, 540 A.2d 871 (App.Div.), *certif. denied,* 111 N.J. 654, 546 A.2d 562 (1988); *Wimmer v. Coombs,* 198 N.J.Super. 184, 188, 486 A.2d 916 (App.Div.1985); *Boyd v. Steele,* 107 N.J.Super. 405, 410, 258 A.2d 719 (App.Div.1969).

Defendants, without making any reference to *Goncalvez,* seek to employ a recent Law Division case, *Hauck v. Danclar,* 262 N.J.Super. 225, 620 A.2d 479 (Law Div.1993), to support their assertion that the loss of consortium action is both derivative *and* independent.[13] In *Hauck,* a husband who assert-

**13.** Defendants also refer to *Procanik* in this consortium context. Defendants note that in *Procanik,* the court found that the parents' claims of emotional distress were independent of the claim asserted by the infant plaintiff. The parents' right to recover was based on a direct injury to their own right, not upon any injury to their child. *Procanik,* 97 N.J. at 355–56, 478 A.2d 755. Ostensibly, defendants seek to dress the adult plaintiffs' loss of consortium claim in the borrowed robes of an emotional distress action. However, the independent nature of the emotional injury claim is of no moment in the present discussion, because a claim for emotional distress is significantly different from a *per quod* claim. *Wolfe v. State Farm Ins. Co.,* 224 N.J.Super. 348, 351, 540 A.2d 871 (App.Div.1988). In *Goncalvez v. Patuto,* 188 N.J.Super. 620, 458 A.2d 146 (App.Div.1983), for instance, the release of a wrongful death claim, survival claim, and *per quod* claim by the plaintiff parents did not

bar the decedent's brother from asserting a claim for emotional distress. The court, in so holding, found that:

> [Claimant's] emotional injury claim constitutes his own independent cause of action. Unlike all the claims made in the first action resulting from [decedent's] injury and death, [claimant's] emotional injury claim is not derivative therefrom ·in any practical or technical sense.... Its subsequent maintainability would only be dependent upon its own timeliness.

*Goncalvez,* 188 N.J.Super. at 628, 458 A.2d 146. Clearly, in the instant case a claim for damages predicated on the adult plaintiffs' emotional distress would be barred under the two year statute of limitations. However, plaintiffs' have not asserted a claim for emotional injury, but rather, have asserted the *per quod* action of loss of consortium, companionship and society. As noted, the New Jersey courts have greatly distin-

ed a loss of consortium claim as a result of injuries sustained by his wife due to the alleged negligence of her physician sought leave to have independent representation at trial. *Hauck*, 262 N.J.Super. at 226–27, 620 A.2d 479. The defendant-physician argued in opposition that the husband's *per quod* claim was derivative, only maintainable by reason of the spouse's injury, and hence independent counsel was not required. *Id.* at 227, 620 A.2d 479.

The court, in articulating a kind of independent/derivative dichotomy, stated:

> A husband's consortium claim is distinct from a wife's claim for personal injuries. A husband who sues for loss of consortium sues not in his wife's right but in his own. Obviously, if the wife's claim for personal injuries fails, the husband would have no independent claim for consortium. In that regard, the claim is clearly derivative. However, it is also independent, as the damages which may be awarded to the spouse pursuant to the *per quod* claim are clearly different from the damages which may be awarded to the spouse suffering the direct injury as a result of defendants' alleged negligence.

*Id.*, 620 A.2d 479 (citations omitted). The court found that the plaintiff-husband was entitled to independent counsel, since "[a]lthough the *per quod* claim is dependent on the viability of his wife's claim, if successful, his damages would be different from those available to his wife and he is entitled to counsel of his own choosing to pursue those damages." *Id.* at 228, 620 A.2d 479.

Thus, it appears that the independent status, to the extent it exists, of the loss of consortium action rests upon the element of damages. *See, e.g., Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 574 (3d Cir.1976) (under New Jersey law, husband asserting *per quod* claim is suing in his own right for his out-of-pocket expenses). While a wife's action for loss of her husband's consortium,

for instance, has its genesis in, and hence is derivative from, the initial injury to her husband, it is independent from any claim her husband might assert insofar as there are separate, distinct and quantifiable damages which she can attain. The consortium action has a kind of dual status, being derivative in its origin but independent in its ultimate pecuniary consequences.

Since there is precedent (*i.e., Goncalvez* ) stating that N.J.S.A. 2A:14–2.1 specifically applies to parental *per quod* claims, it is clear that defendants' interpretation of the independent status of the parental loss of consortium claim must be rejected. *See Goncalvez,* 188 N.J.Super. at 629–30, 458 A.2d 146.[14] However, even if *Goncalvez* were not dispositive here, I would reach the same conclusion by simply grafting upon the parental *per quod* claim the same derivative status as New Jersey courts have accorded the spousal *per quod* action. Having so stated, I would also find that the parental loss of consortium claim's derivative status is sufficient to place it within N.J.S.A. 2A:14–2.1, which pertains to a parent who "has a claim for damages suffered by him because of an injury to a minor child caused by the wrongful act, neglect or default of any person." N.J.S.A. 2A:14–2.1. Thus, in the instant case the adult plaintiffs' claim is not in fact time barred by the applicable two year statute of limitations, but rather, has been timely asserted pursuant to the provisions of N.J.S.A. 2A:14–2.1.

This conclusion is supported not only by precedent, but by logic and equity as well. While a consortium claim may have independent elements, there is no reason why its independent status should be accorded greater weight than its derivative aspect such that application of a legislative provision, which depends entirely upon that derivative status, is obviated. In the instant case, but for the alleged negligence of defendants, Gail and Craig Carter would not have lost the consor-

---

guished their treatment of the former from the latter. Therefore, defendants' reliance on *Procanik* insofar as it speaks to the independent status of an emotional distress claim is misplaced.

14. Indeed, the Appellate Division, in reconciling the derivative yet separate nature of a spousal *per quod* claim, noted that "such a claim is separate only in the sense that it is a separate element of a damage claim." *Wolfe v. State Farm Ins. Co.,* 224 N.J.Super. 348, 351, 540 A.2d 871 (App.Div. 1988).

tium and companionship of their son. Were this Court to validate defendants' view of the completely independent nature of the parental *per quod* claim, then there is no way that the adult plaintiffs can seek refuge under N.J.S.A. 2A:14–2.1. But if a parental claim which arises from a purported act of negligence committed against the minor child cannot be found to implicate that statute, then, as even defendants' counsel recognized at oral argument, there apparently can be no such thing as a derivative claim which can fit within the statute. *See* Transcript of Proceedings, July 26, 1993, at 12–15.

However, to so hold would be to denude entirely the aforementioned statute of any benefit for parents. Accordingly, the adult plaintiffs' claim for loss of consortium, companionship and society may be asserted in the instant action pursuant to N.J.S.A. 2A:14–2.1.

### CONCLUSION

For the reasons expressed above, the adult plaintiffs' claim for extraordinary medical expenses and for loss of services, consortium, companionship, and society may be asserted in the instant action pursuant to N.J.S.A. 2A:14–2.1. Accordingly, defendants' motion for partial summary judgment is hereby **DENIED.**

**SO ORDERED:**